## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JERMINA LAQUA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>VERDE ENERGY USA NEW YORK, LLC,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jermina LaQua ("Plaintiff"), by and through her undersigned counsel, on behalf of herself and all other persons similarly situated, brings this Class Action Complaint against Verde Energy USA New York, LLC ("Verde" or "Defendant"), and alleges as follows upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief based upon, *inter alia*, investigations conducted by her attorneys.

### INTRODUCTION

1.     This action is brought as a class action on behalf of Plaintiff and a putative class of New York consumers seeking redress for the deceptive and bad faith pricing practices of Defendant that have caused at least tens of thousands of consumers to pay considerably more for their electricity than they should otherwise have paid.

2.     Verde, an independent energy company or "ESCO", has exploited the deregulation of the retail electricity market by luring consumers into switching electricity suppliers using a bait-and-switch scheme designed to deceive reasonable consumers.  Verde lures its customers into switching to its electricity supply services by offering, for a limited period of time, initial low teaser rates for electricity.  Once the initial rate expires, however,

Verde automatically switches its customers over to its Variable Rate.  Verde represents that its Variable Rate each month is based on "market conditions."  A reasonable consumer thus expects that after the teaser rate expires, he or she will pay a Variable Rate that reflects (or changes with) the wholesale cost of electricity and local competitors' rates — the two primary components of any market.

3.      Despite its explicit representations that customers would receive low cost power (including reinforcement of that misrepresentation through its website address, www.lowcostpower.com and Welcome Letters stating, "We look forward to providing you with 100% renewable energy at a ***very competitive*** rate…") (emphasis added), the rates Verde charges its customers are not low cost, but are instead substantially higher than the rates of its competitors (i.e., the local utility company and ESCOs); the rates are invariably higher than Verde's own initial teaser rates; and the rates are wholly disconnected from wholesale electricity market pricing.  In short, nothing indicates that Verde's Variable Rates rise and fall with any discernable indicator of "market conditions."

4.      Indeed, as set forth below, Verde routinely charges its consumers nearly ***two times*** the underlying market rate, notwithstanding Verde's representations that the customer will receive electricity from Verde at a Variable Rate, and that its Variable Rates may "change" monthly with market conditions.  Specifically, even when the market price goes down, Verde's rates do not decrease, but instead remain at an extraordinarily high premium rate for electricity ***regardless*** of fluctuations in the underlying market price.

5.      Verde makes additional representations that it offers "low-cost" and "very competitive" electric rates.  But what Verde does not inform customers is that its Variable Rate

is virtually always substantially higher than, and not competitive with, other rates available in the market and is significantly higher than Verde's own Fixed Rates.

6.      Verde's unfair and deceptive scheme of charging inflated electric prices that match *increases* in the underlying market price while failing to pass along corresponding *decreases* is intentionally designed to maximize revenue for Verde.  Consumers, such as Plaintiff and the Class, were deceived into believing that Verde would provide market-based rates when, in reality, Verde sets its prices at significantly above wholesale market rates and Verde's competitors' rates.

7.      No reasonable consumer would interpret or understand Verde's pricing representations as granting Verde unfettered discretion to raise its Variable Rates as high as it pleases in order to maximize profits, such that the Variable Rate bears no resemblance to electricity market pricing.  Further, no reasonable consumer would knowingly agree to pay higher power rates than what were previously being paid without additional services or enhancements, which are not provided by Verde.  Indeed, any contrary interpretation would render the contract's variable rate pricing terms meaningless.

8.      As a result of Verde's unfair and deceptive overcharging scheme, New York consumers are being fleeced millions of dollars in exorbitant charges for electricity.

9.      Plaintiff, on behalf of the class she seeks to represent, brings this lawsuit based on Verde's unlawful and unconscionable consumer practices under the N.Y. G.B.L. § 349 and N.Y. G.B.L. § 349-d, *et seq*. as well as Verde's breach of contract and breach of the implied covenant of good faith and fair dealing, and alternatively, for unjust enrichment.  Through its deceptive and unconscionable practices, upon information and belief, Verde bilked the class of tens of thousands of current and former Variable Rate customers out of millions of dollars.

Accordingly, this lawsuit seeks, *inter alia*, injunctive relief, actual damages and refunds, treble damages, punitive damages, attorneys' fees, and the costs of this suit.

## PARTIES

8.      Plaintiff Jermina LaQua is a resident and citizen of Brooklyn, New York.

9.      Defendant Verde Energy USA New York, LLC is a corporation organized under the laws of the State of Delaware whose principal place of business is located at 101 Merritt Seven Corporate Park, Norwalk, CT 06851.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction of the claims asserted herein pursuant to 28 U.S.C. § 1332(d)(2)(A) in that the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which members of the putative plaintiff class (the "Class Members" or "Class") are citizens of States different from Defendant.  There are at least 100 members in the putative class.

11.      This Court has general personal jurisdiction over Defendant.  Defendant does business in New York through continuous, permanent, and substantial activity in New York.

12.      This Court has specific personal jurisdiction over Defendant because it maintains sufficient contacts in this jurisdiction, including the advertising, marketing, distribution and sale of electricity to New York consumers.

13.      Venue is proper pursuant to 15 U.S.C. § 80b-14 and 28 U.S.C. § 1391. Defendant regularly transacts and solicits business in this District, and Plaintiff resides in this District.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

**A.     Energy Deregulation and the Role of ESCOs**

14.     In the late 1990s and early 2000s, many states moved to deregulate parts of the electricity supply services performed by large public utilities.  Delivery of electricity to a consumer requires both the creation of electricity and the transmission of that electricity from the power plant to the consumer.  The typical pattern was to require the public utilities to divest their power generation assets such as coal, gas and nuclear power plants.  However, the regulated utilities continued distributing power from these power plants to consumers through transmission lines.  One of the primary goals of deregulation was increased competition in the industry, with a focus on achieving greater consumer choice and reducing energy rates.

15.     In an energy deregulation state like New York, the utility company is not allowed to profit from buying or selling energy.  Whatever the energy costs the utility company to produce or procure is what they may charge the customer.  They can profit only from the delivery.  They own the wires the energy is sent through and get paid for the delivery of the energy no matter where it comes from.  Of course, utilities still must cover for ordinary operating expenses, such as rent, payroll, supplies, marketing, and overhead.  Thus, local utilities cannot simply buy electricity at the wholesale market rate and sell it to their customers at that same rate.

16.     In contrast, ESCOs can profit from buying and selling energy to customers, because they are not subject to the same regulations as utility companies.  Thus, deregulation enables energy customers to shop for electric services by separating the supply and delivery portion of these services, and opening up the supply portion to competition from ESCOs.  This supposedly enables consumers to shop around for the best price on their energy supplies and in turn, save money on their energy bills.

17.     In deregulation states, ESCOs may compete to supply the energy services, but the local utility companies continue to deliver power through their wires regardless of which company supplies them.  In addition, the local public utility may continue to supply metering, billing, and related administrative services to the consumer, regardless of who supplies the energy services.  Thus, the public utility continues to generate and send periodic bills directly to the consumer for the energy it supplies and/or delivers, even after a consumer has enrolled in or "switched" to an ESCO.  The fact that the energy services for which the customer is being billed is now being supplied by an ESCO is noted on the bill, often in very fine print that is easily overlooked.  The bill otherwise looks substantially the same as it did before the switch.

18.     Although deregulation may increase competition for energy service companies, because there is no regulatory authority over the prices that ESCOs charge their customers, these unregulated suppliers are not required to purchase long-term energy contracts, as required of local utility companies, that would help insulate residential customers from sharp price fluctuations.

19.     Because the prices they charge their customers are not regulated, ESCOs often choose to offer variable rate contracts, giving them the ability to change their rates to meet market conditions.  When market conditions cooperate, an ESCO is able to offer potential customers significant cost savings in order to lure them into entering into a contract.

**B.     The History of New York's Energy Industry**

20.     In 1996, New York deregulated the market for electricity supply, a major break with past policy.  Prior to deregulation, electricity was supplied and distributed solely by local utility companies.

21.     As part of the deregulation plan, ESCOs (like Verde) do not have to file the electricity rates they charge with the New York State Public Service Commission ("NYPSC") or seek approval for or disclose the method by which they set their rates.

22.     ESCOs such as Verde have various options to buy electricity at wholesale for resale to retail customers in New York, including: owning electricity production facilities; purchasing electricity from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and by purchasing electricity in advance of the time it is used by consumers, either by purchasing electricity to be used in the future or by purchasing future and forward contracts for the delivery of electricity in the future at a predetermined price. The point of deregulation is to allow ESCOs to use these and other innovative purchasing strategies to reduce electricity costs, thereby passing off some of those cost savings to their customers and offering competitive prices to their customers.

23.     If a customer switches to an ESCO, his or her energy will be "supplied" by the ESCO, but still "delivered" by their existing utility. The customer's existing utility continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is which company sets the price for the customer's energy supply.

24.     Verde takes advantage of the deregulation and the lack of regulatory oversight in the energy market to deceptively charge New York consumers exorbitant rates for electricity. In theory, energy deregulation allows consumers to shop around for the best energy rates. However, Defendant exploits deregulated markets by using the false promise of competitive rates based on market conditions in order to deceive consumers into purchasing energy from it. In fact, Verde's rates are substantially higher than rates charged by local utilities or other ESCOs, bear no relation to market rates, and are not tied to the wholesale cost of electricity.

**C.**     **The Failure of Energy Deregulation and Resulting Harm to Consumers**

25.     Almost all states that deregulated their energy markets did so in the mid- to late-1990s.  This wave of deregulation was frantically pushed by then-corporate behemoth Enron.  For example, in December 1996 when energy deregulation was being considered in Connecticut, "the most aggressive proponent" of deregulation, Enron CEO Jeffrey Skilling, said:

> Every day we delay [deregulation], we're costing consumers a lot of money . . . .  It can be done quickly.  The key is to get the legislation done fast.[1]

26.     Changing the industry under this sense of urgency and with inadequate protections against abuse resulted in serious harm to consumers in deregulated states, and has spawned a return to sensible regulation.  The number of full or partially deregulated states has dwindled to only seventeen and the District of Columbia, down from forty-two states in 2001 that had started or were considering deregulation.  Even some deregulated states have recognized deregulation's potential harm to everyday consumers and now only allow large-scale consumers to shop for their energy supplier.

27.     Responding to shocking energy prices often paid by ordinary consumers, many key supporters of deregulation now regret the role they played.  For example, reflecting on Maryland's failed deregulation experience, a Maryland Senator commented: "Deregulation has failed.  We are not going to give up on re-regulation till it is done."[2]

28.     A Connecticut leader who participated in that state's experiment with energy deregulation was similarly regretful:

---

[1] Christopher Keating, Eight Years Later . . . "Deregulation Failed" HARTFORD COURANT, Jan. 21, 2007.
[2] David Hill, State Legislators Say Utility Deregulation Has Failed in its Goals, THE WASHINGTON TIMES, May 4, 2011.

Probably six out of the 187 legislators understood it at the time, because it is so incredibly complex . . . .  If somebody says, no, we didn't screw up, then I don't know what world [they] are living in.  We did.[3]

29.     Verde has been the subject of an investigation into the company's deceptive practices.  According to the Columbus [Ohio] Dispatch, in the last few months Ohio regulators, upon recommendation of Public Utilities Commission of Ohio ("PUCO"), have initiated an investigation against Verde's deceptive billing, misleading and deceptive practices, and enrollment disputes in Ohio.  According to the article, "Between [October 1, 2018] and April 12, [2018] the PUCO said it received 231 complaints related to enrollment disputes, misleading information and instances of false representations where Verde claimed to be another utility."[4]

30.     As a result of the PUCO investigation, Verde has suspended all marketing and enrollments in Ohio.[5]

31.     Similarly, New York has expressed serious concerns about the improper practices of ESCOs, like Verde, who operate in New York.

32.     The NYPSC has taken note of the deceptive acts and practices among ESCOs in New York.  In 2016, the NYPSC stated that after considerable experience with energy service to mass-market customers by ESCOs, it determined that the retail markets serving mass-market customers are not providing sufficient competition or innovation to properly serve consumers.  As a result, the NYPSC is opening an evidentiary hearing to examine measures that must be

---

[3] Keating, supra note 5.
[4] *See* https://www.dispatch.com/business/20190417/puco-launches-investigations-against-palmco-and-verde-energy-over-sales-tactics, last viewed July 15, 2019.
[5] Energy Choice Matters, Retail Supplier Voluntarily Suspends Marketing, Enrollments In State Pending Investigation Settlement Discussions, http://www.energychoicematters.com/stories/20190508yd.html, last viewed July 15, 2019.

taken to ensure that these customers can pay just and reasonable rates for commodity and other services from ESCOs.[6]

33.     Here, Verde has deceived New York residents into enrolling in its electricity plans.  This class action seeks to recover for New York residents the amounts above and beyond reasonable market rates that Verde deceived Plaintiff and the Class into paying as a result of the bait and switch scheme.

### C.      Verde Charges Improper and Deceptively High Electricity Rates

34.     Verde engages in a classic bait and switch pricing scheme.   Verde lures consumers into switching to its electricity supply service by offering fixed teaser rates that are lower than its regular rates, while leading consumers to believe that the subsequent rates will be less than those offered by their local utilities and other ESCOs in the market.

35.     Plaintiff's experience with Verde is typical.  In or around May 2015, Plaintiff was solicited via telephone by Verde who made promises to Plaintiff that she would receive a lower rate compared to her local utility, ConEdison ("ConEd"), if she switched.  Based on these promises, Plaintiff made the switch shortly thereafter.

36.     Plaintiff received a Welcome Letter in the mail from Verde, dated May 11, 2015, in which Verde represented that "We look forward to providing you with 100% renewable energy *at a very competitive rate* . . ." (Emphasis added).  The Letter further refers Plaintiff to Verde's website, lowcostpower.com.  Plaintiff's Welcome Letter is attached hereto as **Exhibit A**.

37.     Based on Verde's promises, Plaintiff and other reasonable consumers understand that Verde's variable rates ("Variable Rate") are competitive with other rates in the market.

---

[6] See http://documents.dps.ny.gov/search/Home/ViewDoc/Find?id=%7BF3E31C9F-5A4F-4B3E-AE5E-3624B3D691BA%7D&ext=pdf (last accessed on April 15, 2019).

38.     Furthermore, Plaintiff was provided with a solicitation in the form of a standard "Terms and Conditions of Service," (the "Agreement") attached hereto as **Exhibit B**.  Verde's Agreement makes this express link between its Variable Rate and the underlying wholesale market rate, stating "Verde will supply electricity to Customer at a 100% renewable variable generation rate that may change monthly with market conditions."

39.     Neither the Terms and Conditions of Service nor the Welcome Letter contained any language indicating that Variable Rates may be set at Verde's discretion.

40.     Accordingly, a reasonable consumer would understand that Verde's Variable Rates would be reasonably related to and change in a manner correlated with the underlying wholesale market rate.  In other words, a reasonable consumer would infer a direct link between the two rates.  Indeed, a reasonable consumer would infer that as the NYISO Average Wholesale rate ("wholesale market rate") falls, so will Verde's Variable Rate for retail customers.  There would be no conceivable reason for a consumer to sign up for Verde's energy plan if he or she did not believe he or she would receive a better overall deal on their electricity, based on its advantage in obtaining and proving competitive prices in the energy marketplace.

41.     Instead, and contrary to reasonable consumer expectations and the terms of Verde's Agreement, Verde used its Variable Rates as a pure profit center, increasing the rates charged to Plaintiff and class members when wholesale prices rose, but staying at a level almost *two times* the wholesale market rate when the wholesale prices fell.

42.     In addition to its Welcome Letter, Verde's Terms and Conditions of Service refers to its website:  www.lowcostpower.com (*See* **Exhibit B**).

43.     Reading these statements along with the website name, Plaintiff and other consumers reasonably concluded that Verde was offering them "low cost power" at low Variable Rates relative to other prices offered in the market.

44.     The home page of the website contains numerous representations, separate and apart from Verde's Terms and Conditions of Service or any contract with Plaintiff, including representations that Verde provides "competitive electricity rates."   As such, Plaintiff and a reasonable consumer would understand that Verde provides its customers with "low cost power" and "competitive" rates for electricity.

45.     A screenshot of the home page of Verde's website, www.lowcostpower.com, is shown below.  These representations reinforce Verde's promise to provide competitive, low-cost rates to Plaintiff and all Verde customers.



**KEEPING ENERGY CHOICE SIGNIFICANT**

Join other smart consumers who have selected Verde Energy for 100% renewable energy. Make real changes in your everyday cost of living and your impact on the environment starting with your electric bill. Green energy is a smart and sustainable decision that makes sense. We are proud to offer competitive electricity rates for 100% renewable energy. Simply, the right choice for you and the environment, and with our $100 Rebate, it makes sense for your wallet too!

Enter your Zip Code          FIND YOUR BEST RATE

46.     Thus, Verde misleadingly states that its rates are competitive with rates otherwise available in the market by representing that its rates are "competitive" on its website.

47.     The Agreement provided Ms. LaQua with a three-day rescissionary period during which she could rescind the Agreement prior to its commencement should she not agree to its terms.   Specifically, the Agreement states that, "Customer may rescind this Agreement . . . within 3 business days of receipt of this Agreement." *See* Exhibit B.   Thus, during that rescissionary period, the Agreement served as a solicitation in which Defendant identified the basis upon which the promised variable rate would be determined.

48.     Based on Verde's representations, Plaintiff decided to switch to Verde for electricity in or around May 2015.  Plaintiff was initially placed on Verde's fixed, teaser rate plan for six months.  She paid 14.99 cents per kWh during this period.

49.     After the six-month teaser period ended, Plaintiff's account was automatically rolled over to Verde's Variable Rate plan.  Plaintiff began paying Verde's Variable Rate in December 2015.  However, rather than providing low-cost, competitive electric rates that were tied to wholesale market conditions, Verde charged Plaintiff exorbitant monthly rates that were far higher than local competitors' rates and did not change or vary with wholesale market conditions.

50.     As it is difficult for consumers to determine and compare the rates being charged by Verde versus other ESCOs or the local utility companies given that the data is not readily discernable, Plaintiff and other consumers continued to pay exorbitant rates for many months or years after switching to Verde.

51.     Plaintiff overpaid for electricity based on Verde's unfair and deceptive acts and practices.  She would not have enrolled in Verde's plan but for its false representations.  Had

Plaintiff known that Verde's rates would be significantly and consistently higher than the wholesale market rate, that the rates would not decrease in line with market rates, or that Verde would not provide her with a competitive, low cost electric rate, she would not have made the decision to switch from ConEd and enroll in Verde's plan.

52.     Plaintiff paid Verde's Variable Rate until approximately August 2019, after which, upon discovering that Verde was charging exorbitant rates as compared to ConEd, she ended her Verde service and returned to ConEd.   The following table identifies the billing periods during the time Ms. LaQua was a Verde customer, the variable rates Verde charged Plaintiff, and the corresponding rates that ConEd would have charged her for electricity had she not switched to Verde's plan.   This chart shows that Verde did not provide Plaintiff with (a) low-cost power; (b) a competitive rate – both, or (c) a rate which decreased in line with market rates—all of which it promised to Plaintiff and other consumers.

| Billing Period[7] | Verde Rate | ConEd Rate[8] | Difference ABOVE ConEd Rate |
|---|---|---|---|
| Service End Date | $/kWh | $/kWh | % |
| 12/28/2015 | $0.149900 | $0.07749 | 93% |
| 1/28/2016 | $0.188594 | $0.09920 | 90% |
| 2/29/2016 | $0.189900 | $0.09206 | 106% |
| 3/29/2016 | $0.170613 | $0.09568 | 78% |
| 4/27/2016 | $0.169900 | $0.10597 | 60% |
| 5/26/2016 | $0.150584 | $0.08220 | 83% |
| 6/27/2016 | $0.135379 | $0.10746 | 26% |
| 7/27/2016 | $0.134900 | $0.10210 | 32% |
| 8/25/2016 | $0.134900 | $0.09841 | 37% |
| 9/26/2016 | $0.134900 | $0.09594 | 41% |

---

[7] The first day of the period is approximately thirty days before.
[8] This is the ConEd Price to Compare, which can be found here: https://www.coned.com/_external/cerates/supply_charges.asp. This is the electricity rate that Plaintiff would have paid had she remained with ConEd and not switched over to Verde's electricity plan.   The price was calculated accordingly and includes the $0.0150 cost of renewable energy certificates had ConEd provided a 100% renewable electricity.

| | | | |
|---|---|---|---|
| 10/25/2016 | $0.168671 | $0.09084 | 86% |
| 11/28/2016 | $0.169900 | $0.08748 | 94% |
| 12/27/2016 | $0.179557 | $0.09373 | 92% |
| 1/27/2017 | $0.179900 | $0.07701 | 134% |
| 2/28/2017 | $0.184900 | $0.08947 | 107% |
| 3/29/2017 | $0.180095 | $0.09948 | 81% |
| 4/26/2017 | $0.189570 | $0.08638 | 119% |
| 5/25/2017 | $0.194559 | $0.11339 | 72% |
| 6/26/2017 | $0.199575 | $0.10878 | 83% |
| 7/26/2017 | $0.199900 | $0.10211 | 96% |
| 8/24/2017 | $0.199900 | $0.09361 | 114% |
| 9/25/2017 | $0.199900 | $0.09554 | 109% |
| 10/24/2017 | $0.199900 | $0.09957 | 101% |
| 11/27/2017 | $0.199900 | $0.08090 | 147% |
| 12/26/2017 | $0.199900 | $0.07912 | 153% |
| 1/26/2018 | $0.199900 | $0.11028 | 81% |
| 2/27/2018 | $0.199900 | $0.08372 | 139% |
| 3/28/2018 | $0.199900 | $0.09013 | 122% |
| 4/26/2018 | $0.199900 | $0.09365 | 113% |
| 5/25/2018 | $0.199900 | $0.10671 | 87% |
| 6/26/2018 | $0.199900 | $0.10786 | 85% |
| 7/26/2018 | $0.199900 | $0.10991 | 82% |
| 8/24/2018 | $0.189900 | $0.08210 | 131% |
| 9/25/2018 | $0.197413 | $0.10378 | 90% |
| 10/24/2018 | $0.199900 | $0.10657 | 88% |
| 11/27/2018 | $0.199900 | $0.08561 | 134% |
| 12/26/2018 | $0.199900 | $0.07676 | 160% |
| 1/28/2019 | $0.199900 | $0.09476 | 111% |
| 2/27/2019 | $0.199900 | $0.08741 | 129% |
| 3/28/2019 | $0.199900 | $0.09147 | 119% |
| 4/26/2019 | $0.199900 | $0.09373 | 113% |
| 5/28/2019 | $0.199900 | $0.09539 | 110% |
| 6/26/2019 | $0.199900 | $0.10756 | 86% |
| 7/26/2019 | $0.199900 | $0.10598 | 89% |
| 8/26/2019 | $0.199900 | $0.08724 | 129% |

53.     ConEd's rates for electricity serve as an ideal indicator of market conditions because they are based on the New York Independent System Operator's ("NYISO")

competitive short-term market (commonly referred to as "real-time" pricing or the "spot market") for wholesale electricity and the and the associated market costs (i.e., ancillary services, installed capacity, and transmission -- the same costs ESCOs such as Verde incur).[9]

54.     ConEd and other New York utilities purchase energy, ancillary services, and capacity from NYISO's wholesale market on a daily basis based on customer consumption, and pass actual costs on to their customers – without any markups or profit.  ESCOs like Verde can also purchase wholesale electricity from NYISO's short-term market, at the same price as the utilities.  Because New York utility rates do not include any profits, they serve as pure reflections of the monthly average market costs of wholesale electricity, associated costs, transmission, and distribution.

55.     ConEd's electricity rates also serve as reliable indicator of actual "market conditions" because ConEd's rates are based on publicly held auctions.  While ConEd and Verde may not purchase electricity in precisely the same manner, over time the costs they incur should be commensurate.  In fact, Verde has a tactical advantage over the utility as it can purchase electricity from a highly competitive electricity market for future use, and therefore its cost for purchasing electricity reflects market prices, albeit over a longer term than daily spot rates.  Therefore, while ConEd's rates may not *precisely* match Verde's rate on a daily rate, they should be commensurate over a period of time, including monthly variations.

56.     That Verde's rate was substantially higher than the local utility's rate therefore demonstrates that Verde's rate is not in fact based on market conditions.  In fact, at some points, Verde charged Plaintiff a rate for electricity that was more than ***110% higher*** than ConEd's rate.  Moreover, while ConEd's rate declined from $0.10657 in October 2018 to $0.08561 in November 2018 to $0.07676 in December 2018, Verde's rate remained steady at $0.199900,

---

[9] All but installed capacity are sold on an hourly basis; installed capacity is sold on a monthly basis.

landing at a premium of 160% on top of ConEd's price.  In addition, Verde charged Plaintiff a rate for electricity that was at times more than 145% higher than ConEd's rates.  If Verde's rate was based on wholesale costs (as any reasonable consumer would expect of a variable rate based on market conditions), then its rate would have also declined during this period (because ConEd's rate is reflective of changes in the wholesale market cost of electricity).

57.     That Verde's rates do not reflect market costs for wholesale electricity is also demonstrated by the disconnect between changes in wholesale electricity prices (as demonstrated by the New York Citygate Price) and Verde's costs.  While the New York Citygate Price might show more short-term fluctuations than Verde's costs, over time, the New York Citygate Price is an accurate reflection of wholesale market costs.

58.     The chart below sets forth (1) the average wholesale price (in cents per kilowatt hour) of electricity delivered to New York for each month during the period from December 28, 2015 through August 2019, the time during which Plaintiff was enrolled in Verde's Variable Rate plan, as reported by NYISO; (2) the Variable Rates Verde charged Plaintiff for those same months as represented by Verde; and (3) the resulting percentage premium that Verde charged consumers compared to the wholesale rate on a per-month basis.  The chart shows that Verde did not provide Plaintiff with (a) low-cost power; (b) a competitive rate – both, or (c) a rate which decreased in line with market rates—all of which it promised to Plaintiff and other consumers.

| Billing Period[10] | Verde Rate | NYISO Average Wholesale Price[11] | Verde Premium ABOVE Average Wholesale Price |
|---|---|---|---|
| Service End Date | $/kWh | $/kWh | % |
| 12/28/2015 | $0.149900 | $0.07290 | 106% |
| 1/28/2016 | $0.188594 | $0.08170 | 131% |
| 2/29/2016 | $0.189900 | $0.07627 | 149% |
| 3/29/2016 | $0.170613 | $0.06741 | 153% |
| 4/27/2016 | $0.169900 | $0.07528 | 126% |
| 5/26/2016 | $0.150584 | $0.07011 | 115% |
| 6/27/2016 | $0.135379 | $0.07213 | 88% |
| 7/27/2016 | $0.134900 | $0.08209 | 64% |
| 8/25/2016 | $0.134900 | $0.08230 | 64% |
| 9/26/2016 | $0.134900 | $0.07367 | 83% |
| 10/25/2016 | $0.168671 | $0.06750 | 150% |
| 11/28/2016 | $0.169900 | $0.07228 | 135% |
| 12/27/2016 | $0.179557 | $0.09272 | 94% |
| 1/27/2017 | $0.179900 | $0.08330 | 116% |
| 2/28/2017 | $0.184900 | $0.07321 | 153% |
| 3/29/2017 | $0.180095 | $0.07870 | 129% |
| 4/26/2017 | $0.189570 | $0.07493 | 153% |
| 5/25/2017 | $0.194559 | $0.07427 | 162% |
| 6/26/2017 | $0.199575 | $0.07283 | 174% |
| 7/26/2017 | $0.199900 | $0.07623 | 162% |
| 8/24/2017 | $0.199900 | $0.07132 | 180% |
| 9/25/2017 | $0.199900 | $0.06892 | 190% |
| 10/24/2017 | $0.199900 | $0.07054 | 183% |
| 11/27/2017 | $0.199900 | $0.07263 | 175% |
| 12/26/2017 | $0.199900 | $0.09220 | 117% |
| 1/26/2018 | $0.199900 | $0.13509 | 48% |
| 2/27/2018 | $0.199900 | $0.07256 | 175% |
| 3/28/2018 | $0.199900 | $0.07049 | 184% |
| 4/26/2018 | $0.199900 | $0.07328 | 173% |
| 5/25/2018 | $0.199900 | $0.06547 | 205% |
| 6/26/2018 | $0.199900 | $0.06830 | 193% |

[10] The first day of the period is approximately thirty days before.
[11] The NYISO Average Wholesale Price is compromised of the NYISO Total (which includes the LMP plus other wholesale charges) and includes the cost of renewable energy credits in order for Verde to provide a 100% renewable rate.

| | | | |
|---|---|---|---|
| 7/26/2018 | $0.199900 | $0.07545 | 165% |
| 8/24/2018 | $0.189900 | $0.07787 | 144% |
| 9/25/2018 | $0.197413 | $0.07403 | 167% |
| 10/24/2018 | $0.199900 | $0.07321 | 173% |
| 11/27/2018 | $0.199900 | $0.07711 | 159% |
| 12/26/2018 | $0.199900 | $0.07714 | 159% |
| 1/28/2019 | $0.199900 | $0.09313 | 115% |
| 2/27/2019 | $0.199900 | $0.07700 | 160% |
| 3/28/2019 | $0.199900 | $0.07893 | 153% |
| 4/26/2019 | $0.199900 | $0.07275 | 175% |
| 5/28/2019 | $0.199900 | $0.06732 | 197% |
| 6/26/2019 | $0.199900 | $0.06734 | 197% |
| 7/26/2019 | $0.199900 | $0.07516 | 166% |
| 8/26/2019 | $0.199900 | $0.07052 | 183% |

59. That Verde's rate was always substantially higher than the NYSIO average wholesale price therefore demonstrates that Verde's rate is not in fact based on market conditions. In fact, as the wholesale rate for electricity declined from $0.07328 to $0.06547 between April and May of 2018, Verde's rate remained constant during the same time period at $0.199900, leading to a 205% overcharge. If Verde's rate was based on wholesale costs (as any reasonable consumer would expect of a variable rate based on market conditions), then its rate would have also declined during this period (because the NYSIO average rate depicts the changes in the wholesale market cost of electricity).

60. Moreover, Verde's costs, other than its wholesale cost of power, were relatively fixed and could not have justified the massive increases alleged above. For example, charges as ancillary and capacity charges did not change to any material extent and, in particular, did not change to a material extent in relation to wholesale power prices (these additional costs are included in the "NYISO average wholesale price" in the chart shown in paragraph 58 above). Verde's other material costs were for operations, and included costs, for example, relating to

rent, equipment, overhead, employees, etc. were also relatively fixed and could not justify the price variations alleged above.

61.     Also, the cost that Verde pays for renewable energy certificates to provide "100% renewable" or "green" energy are fixed and insignificant in terms of the overall costs Verde incurs to provide retail electricity.  Therefore, these other cost factors cannot explain the drastic increases in Verde's Variable Rate or the reason its rates are completely disconnected from variation in wholesale costs.  In fact, the NYISO average wholesale rate listed above, includes Verde's costs for renewable energy certificates.  Even after adding in these costs, Verde's Variable Rates are still priced at an excessive premium well above the market rate.

62.     Moreover, Verde charges exorbitant premiums on its electricity without adding any value to the consumer whatsoever.  As detailed above, Verde neither produces nor transports electricity.  It has no role in running or maintaining power plants or power lines; it does not perform hookups or emergency responses.  Indeed, Verde does not even handle customer billing: that, too, is handled by the local utilities.  Essentially, all that Verde does is act as a trader in the transaction.  Yet it charges multiple times the amount that the local utilities receive for making electricity and that the local utilities receive for transmitting power, maintaining power lines, handling emergency services, and customer billing and calls.

63.     Indeed, all that Verde offers customers is electricity delivered by local utilities, a commodity that has the exact same qualities as electricity supplied by local utilities or other ESCOs.  Other than price, there is nothing to differentiate Verde from local utilities or other ESCOs, and the potential for a competitive price based on market conditions is the only reason any reasonable consumer would enter into a contract for electricity supply with Defendant.

64.     And a reasonable consumer would understand that the price the local utility or other ESCO charges is part of prevailing market conditions and that a price based on market conditions would be consistent with the price charged by the local utility or other ESCO. However, Verde's prices are substantially higher than local utilities' rates, as well as the rates that other ESCOs charge.

65.     Defendant Verde's statements and omissions regarding its electricity rates are materially misleading, as the most important consideration for any reasonable consumer when choosing an energy supplier is price.  No reasonable consumer, including Plaintiff, who knew the truth about Verde's exorbitant rates would choose Verde as an electric supplier, and no reasonable consumer, including Plaintiff, could be expected to uncover the truth until *after* they have paid Verde's exorbitant rates and had the opportunity to *retroactively* compare them to other rates charged during the same time period and in the same location.

66.     Verde's representations that its Variable Rates "may change with market conditions" does not give Verde unfettered discretion to set its rates as it pleases.

67.     As evidenced in paragraphs 52 and 58 above, Verde's rate does not change with market prices.  In fact, for almost two straight years, Verde's Variable Rates *never* change – remaining consistent at an extraordinarily high rate of 19.99 cents per kWh despite changes in market prices.  Thus, it is clear Verde abuses whatever discretion it may be afforded when setting its rates.

68.     Verde knowingly and intentionally made these misleading statements regarding its electric rates so that reasonable consumers like Plaintiff would be enticed by its false and misleading statements and switch their energy supplier to Verde.

69.     Verde's only product is electricity delivered by the local utility and has the exact same qualities as electricity supplied by other local utilities or ESCOs.  There is nothing to differentiate Verde Energy from other local utilities or ESCOs, such that would warrant higher rates, and the potential to pay a reduced rate that is based on market conditions is the only reason Plaintiff and any reasonable consumer would enter into a contract for electricity with Verde.

70.     Verde used its Variable Rates as a pure profit center, increasing the rates charged to Plaintiff and class members when wholesale prices rose, but staying at a level nearly *two times* the average wholesale market rate when the wholesale prices fell.  And Plaintiff's variable rate was consistently higher than her initial rate and often substantially higher than ConEd's rate.

71.     Defendant's misstatements and omissions caused injury to Plaintiff LaQua and other reasonable consumers because they believed that by switching to Verde's electricity plan, they were contracting for a competitive, low-cost Variable Rate tied to the wholesale market rate. Plaintiff would not have enrolled in Verde's plans but for its false representations.  Had Plaintiff known that the rates she would be charged by Verde would be substantially higher than her local utility provider, she would not have made the decision to switch.

72.     Verde breached its consumer contracts as evidenced by Verde's drastic rate disparities with those of the local utility company and the fact that Verde's rates were *always* higher than ConEd's rates during the time Plaintiff was enrolled in Verde's plan.  Verde does not charge a rate based on market conditions as it states in its solicitations and contracts with consumers, but rather gouges its customers by charging outrageously high rates.

73.     Indeed, Verde's customers are charged Variable Rates that are substantially higher than those of its local competitors, higher than Verde's own initial rate offerings, and uncorrelated to reductions that occur in the wholesale rate – all reasonable and plausible

indicators of market conditions – a term which is undefined in Verde's Terms of Service.  Verde intentionally fails to disclose this material fact to its customers because no reasonable consumer, including Plaintiff, who knows the truth about Verde's exorbitant rates would choose Verde as an electricity supplier.

74.     Verde knowingly and intentionally made misleading statements regarding its electric rates so that reasonable consumers like Plaintiff would be induced to switch to Verde's electricity plan.

75.     Verde knows its rates are unconscionably high, and the misrepresentations it makes about its Variable Rates being market-based were made for the sole purpose of inducing consumers to sign up for Verde's electricity supply.  Verde reaps outrageous profits to the direct detriment of New York consumers without regard to the consequences high utility bills cause such consumers.  As such, Verde acted with actual malice or with wanton and willful disregard for consumers' well-being.

76.     As a direct result of Verde's misrepresentations, Plaintiff and members of the putative Class overpaid for electricity and therefore suffered common injuries, for which damages can be calculated.

77.     Had Verde charged Plaintiff a rate that was actually based on market conditions, Plaintiff would have been charged a substantially lower rate for her electricity.  Accordingly, she was injured when she paid her inflated bills.

78.     Similarly, other Class members have routinely paid substantially more for their energy supplies since switching to Verde's electricity plans.

79.     Verde's unfair and deceptive scheme as alleged herein constitutes a continuing violation over the course of each and every time Plaintiff (or any other class member) was

overcharged for electricity. Further, Verde actively concealed its wrongful conduct by maintaining to Plaintiff and other members of the Putative Class, through Verde's marketing, invoicing, and other communications directed to consumers, misrepresenting that the prices Verde charged for electricity were the result of competitive market forces when, in reality, they were the result of Verde's fraud. Plaintiff and other members of the class could not discover through reasonable diligence the nature of Verde's wrongful conduct earlier by virtue of Verde's active concealment of its wrongdoing.

80.     Defendant's violations of N.Y. G.B.L § 349 and N.Y. G.B.L § 349-d, *et seq*. and the common law are applicable to all members of the Class, and Plaintiff is entitled to have Defendant enjoined from engaging in illegal and deceptive conduct in the future.

### ESTOPPEL FROM PLEADING AND TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

81.     Plaintiff was diligent in bringing this action.

82.     Verde wrongfully concealed material facts regarding the calculation of its Variable Rate in its monthly billing statements to Plaintiff. As a result, Plaintiff was ignorant of her causes of action against Verde.

83.     Verde knowingly and actively misrepresented the variable rate calculations in each and every one of Plaintiff's subsequent billing statements. Had Verde not concealed the true nature of its Variable Rate, Plaintiff would have been on notice of the violation.

84.     The information regarding Verde's calculation of its Variable Rate was at all times exclusively within Verde's possession and control.

85.     Verde's own documents, as described herein, indicate that it affirmatively misled Plaintiff and class members regarding how its Variable Rate is calculated.

86.     In the face of this evidence, Verde continues to deny that it misrepresents its variable rate billing, perpetuating its concealment.

87.     A reasonable consumer in these circumstances would have been unaware of the existence of their cause of action against Verde.

88.     Accordingly, Verde is estopped from relying on any statutes of limitation or repose due to its acts of concealment.  Verde knowingly misled consumers as to the true nature of its Variable Rate.   Verde knowingly concealed and maintained exclusive control over information concerning the variable rate calculation; Plaintiff and class members, therefore, could not have reasonably known the method of calculating Verde's Variable Rate.  Thus, Verde is estopped from relying on any statutes of limitations or repose that might otherwise be applicable to the claims asserted herein.

## CLASS ACTION ALLEGATIONS

89.     Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the following class of similarly situated persons:

> All persons enrolled in a Verde Energy variable rate electric plan in connection with a property located within New York at any time within the applicable statutes of limitations preceding the filing of this action through and including the date of judgment (the "Class").

90.     Plaintiff reserves the right to modify or amend the definition of the proposed Class or to propose sub-classes as might be necessary or appropriate.

91.     Excluded from the Class are Defendant, including any parent, subsidiary, affiliate or person controlled by Defendant; Defendant's officers, directors, agents or employees; the judicial officers assigned to this litigation; and members of their staffs and immediate families.

92.     The proposed Class meets all requirements for class certification.   The Class satisfies the numerosity standard.  The Class is believed to number in the tens of thousands of

persons.   As a result, joinder of all class members in a single action is impracticable.   On information and belief, class members can be identified by Verde and utility company records.

93.     There are questions of fact and law common to the Class which predominate over any questions affecting only individual members.   The questions of law and fact common to the Class arising from Verde's actions include, without limitation, whether Verde:

a.      violated N.Y. G.B.L § 349;

b.      violated N.Y. G.B.L § 349-d; *et. seq*;

c.      breached its contract with regard to its Variable Rate;

d.      breached its covenant of good faith and fair dealing with regard to its Variable Rate contracts;

e.      was unjustly enriched through its Variable Rate policies and practices; and

f.      continues to commit wrongdoing through its Variable Rate policies and practices.

94.     The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness and equity to other available methods for the fair and efficient adjudication of this controversy.

95.     Plaintiff is an adequate representative of the Class because she is a member of the Class and her interests do not conflict with the interests of the members of the class she seeks to represent.   The interests of the members of the Class will be fairly and adequately protected by Plaintiff and her undersigned counsel, who have extensive experience prosecuting complex class action litigation.

96.     Plaintiff's claims are typical of the claims of the Class because they arise out of the same conduct, policies, and practices of Verde with respect to its Variable Rate policies and

practices.  Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other putative class member.

97.     Maintenance of this action as a class action is a fair and efficient method for the adjudication of this controversy.  It would be impracticable and undesirable for each class member who suffered harm to bring a separate action.  In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all class members.

98.     Notice can be provided to Class members by using techniques and forms of notice similar to those customarily used in other class actions.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF N.Y. GENERAL BUSINESS LAW § 349
### (On Behalf of Plaintiff and the Class)

99.     Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

100.     Plaintiff brings this Count on behalf of herself and the Class.

101.     The New York General Business Law § 349 provides, *inter alia*:

> Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

N.Y. Gen. Bus. Law § 349(a).

102.     Verde is engaged in "trade" and "commerce" as it offers electricity for sale to consumers.  By misrepresenting that its Variable Rates for electricity were competitive market-based rates, Defendant committed unfair methods of competition and unfair and deceptive acts and practices in the conduct of a trade or commerce.

103.    By misrepresenting that its Variable Rates for electricity were "very competitive" market-based rates, Verde made material representations of fact that it knew, or should have known, were false and misleading and that had the tendency and capacity to be misleading.

104.    Defendant's misrepresentations and false, deceptive, and misleading statements and omissions with respect to the Variable Rates it charges for electricity, as described above, constitute affirmative misrepresentations in connection with the marketing, advertising, promotion, and sale of electricity in violation of the New York General Business Law.

105.    Defendant's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to purchase electricity from Defendant.

106.    By repeatedly referencing the website www.lowcostpower.com in Verde's Terms of Service, Defendant willfully misrepresented to reasonable consumers that its variable prices for power were "low cost" when in fact they were not.

107.    Verde represents on its website that its rates are "very competitive" with the rates otherwise available in the market.  Verde further represents that its energy is "low cost."  These representations are false and misleading.

108.    Indeed, Verde's website address and content knowingly misrepresented to consumers that its pricing was a "competitive" option when it was in fact dramatically higher than and uncorrelated with wholesale prices, and higher than the local utility company prices and other ESCOs' prices.

109.    Defendant also failed to inform customers that its Variable Rates for electricity are substantially higher than those based on the market conditions in the electricity market and do not reflect the wholesale cost of purchasing electricity.  That information would have been material to any consumer deciding whether to purchase electricity from Defendant.

110.    Defendant further deceptively and consciously misrepresented the most determinative factors it uses to set variable rates.

111.    Defendant knew at the time it promised prospective customers that they would be charged a variable rate based on market conditions that this promise was false.

112.    Defendant made these false, deceptive, and misleading statements and omissions with the intent that consumers rely upon such statements.

113.    Defendant's intentional concealments were designed to deceive current and prospective Variable Rate customers into believing that rates will be commensurate with market conditions in the Terms and Conditions of Service.  Defendant benefits from reliance and deprives consumers from informed purchasing decisions and competitive rates.

114.    Verde's conduct as alleged above constitutes a deceptive act or practice.  Verde's Variable electric rate representations as set forth above were and are likely to mislead consumers and Verde intended that consumers rely upon those representations.  Plaintiff and other reasonable consumers reasonably interpreted Defendant's representations to mean that Verde's Variable Rates track the underlying wholesale power rates (when in fact they do not).  Plaintiff and other reasonable consumers reasonably interpreted Defendant's representations to mean that Verde's Variable Rates were competitive (when in fact they were not).  Verde's representations were material to a reasonable consumer and likely to affect consumer decisions and conduct, including purchases of power from Verde pursuant to variable rate contracts.

115.    Defendant's affirmative conduct and omissions constitute unlawful practices beyond a mere breach of contract.  Rather, Defendant's practices are unconscionable and outside the norm of reasonable business practices.  No reasonable consumer would enter into an energy contract in which the ESCO is permitted to charge whatever rates it wants.  Yet, by deceiving

consumers, Verde has managed to convince them to enter into exactly this kind of contract. This is plainly an unconscionable result.

116.    Verde's conduct as alleged above also constitutes a deceptive act or practice. Verde's Variable electric rate representations as set forth above were and are likely to mislead consumers and Verde intended that consumers rely upon those representations. Plaintiff and other reasonable consumers reasonably interpreted Defendant's representations to mean that Verde's Variable rates track the underlying wholesale power rates (when in fact they do not). Plaintiff and other reasonable consumers reasonably interpreted Defendant's representations to mean that Verde's Variable rates were competitive (when in fact they were not). Verde's representations were material to a reasonable consumer and likely to affect consumer decisions and conduct, including purchases of power from Verde pursuant to Variable Rate contracts.

117.    Plaintiff and the other members of the Class entered into agreements to purchase electricity from Defendant for personal, family, or household use, and suffered ascertainable losses as a direct and proximate result of Defendant's actions in violation of the New York General Business Law.

118.    As a consequence of Defendant's wrongful actions, Plaintiff and the other members of the Class suffered an ascertainable loss of monies based on the difference in the rates they were charged versus the rates they would have been charged had Defendant charged rates based on market conditions, as specified in the Terms and Conditions of Service, or had they not switched to Defendant from their previous utility provider.

119.    Plaintiff and the other members of the Class suffered an ascertainable loss caused by Defendant's misrepresentations and omissions because they would not have entered into

agreements to purchase electricity from Defendant if the true facts concerning its rates had been known.

120.    By reason of the foregoing, Defendant is liable to Plaintiff and the other members of the Class for actual damages; injunctive relief, attorneys' fees, and the costs of this suit.

### COUNT II
### VIOLATION OF N.Y. GENERAL BUSINESS LAW § 349-d(3)
### (On Behalf of Plaintiff and the Class)

121.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

122.    Plaintiff brings this Count on behalf of herself and the Class.

123.    N.Y. G.B.L. § 349-d(3) provides that "[n]o person who sells or offers for sale any energy services for, or on behalf of, an ESCO shall engage in any deceptive acts or practices in the marketing of energy services."

124.    N.Y. G.B.L. § 349-d(l0) provides that "any person who has been injured by reason of any violation of this section may bring an action in his or her own name to enjoin such unlawful act or practice, an action to recover his or her actual damages or five hundred dollars, whichever is greater, or both such actions.  The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to ten thousand dollars, if the court finds the defendant willfully or knowingly violated this section.  The court may award reasonable attorney's fees to a prevailing plaintiff."

125.    Defendant knowingly and willfully misrepresented to Plaintiff and the Class that its rates are based on market conditions and reflective of wholesale electricity costs in the market when its rates are not, in fact, based on market conditions.  Defendant knowingly and willfully

31

fails to inform consumers of the material fact that its rates are substantially higher than those otherwise available in the market.

126.     Through its conduct described above, Defendant has engaged in deceptive acts and practices that resulted in injury to Plaintiff and the other members of the Class.

127.     By reason of the foregoing, Defendant has violated N.Y. Gen. Bus. Law § 349-d, and should be enjoined from continuing to fail to disclose that its rates are substantially higher than those otherwise available in the market and misrepresenting that its rates are based on market conditions.  Defendant is also liable to Plaintiff and the other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial but not less than $500.00 for each violation, such damages to be trebled, plus attorneys' fees and costs.

**COUNT III**
**VIOLATION OF N.Y. GENERAL BUSINESS LAW § 349-d(7)**
**(On Behalf of Plaintiff and the Class)**

128.     Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

129.     Plaintiff brings this Count on behalf of herself and the Class.

130.     Section 349-d.7 provides that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified."

131.     None of Verde's marketing materials adequately disclose that Verde charges a variable rate in a clear and conspicuous manner.  Verde's marketing materials fail to provide a clear and conspicuous explanation of the factors affecting Verde's variable rates.

132.     The Agreement Verde provided to customers likewise fail to clearly and conspicuously inform consumers about Verde's Variable Rates or the factors affecting those rates.

133.     Through its conduct described above, Verde has violated Section 349-d.7 and caused financial injury to Plaintiff and Verde's other variable rate customers by causing Plaintiff and Class members to pay more for electricity than they would have otherwise paid had they stayed with their previous energy supplier or chosen a different energy supplier.

134.     As a direct and proximate result of Verde's conduct, Plaintiff and the Class suffered injury and were damaged in an amount to be determined at trial, but in any case not less than $500 for each violation.

135.     As shown above, Verde willfully or knowingly violated Section 349-d.

136.     Because Verde's violations of Section 349-d have damaged Plaintiff and the Class, and Defendant's continued violations threaten additional injury for which Plaintiff and the Class have no adequate remedy at law, Plaintiff seeks an order pursuant to Section 349-d enjoining Verde from such future conduct.

137.     Pursuant to Section 349-d, Plaintiff seeks actual, statutory, and treble damages, costs and expenses, pre and post-judgment interest, and attorneys' fees.

**COUNT IV**
**BREACH OF CONTRACT**
**(On Behalf of Plaintiff and the Class)**

138.      Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

139.     Plaintiff brings this Count on behalf of herself and the Class.

140.     Plaintiff and the Class entered into a valid contract with Verde for the provision of electricity (the "Agreement"), Exhibit B.

141.     Pursuant to the Agreement, Defendant agreed to charge a variable rate for electricity purportedly based on market conditions.

142.     The Agreement does not contain any language permitting Verde to set its Variable Rates in whole, or in part, based on its sole discretion.

143.     Pursuant to the Agreement, Plaintiff and the other members of the Class paid the variable rates charged by Defendant for electricity.

144.     However, Defendant failed to perform its obligations under the Agreement because it charged variable rates for electricity that were not based on the market conditions which the parties agreed the rates would be based.

145.     Plaintiff and the other members of the Class were damaged as a result because they were billed, and they paid, a rate for electricity that was higher than it would have been had Defendant based its rates on the agreed upon factors.

146.     By reason of the foregoing, Defendant is liable to Plaintiff and the other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

## COUNT V
### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (On Behalf of Plaintiff and the Class)

147.     Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

148.     Plaintiff brings this Count on behalf of herself and the Class.

149.    Every contract in New York contains an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of a contract's express terms.

150.    Under the contract, Defendant had unilateral discretion to set the variable rates for electricity based on market conditions.

151.    Plaintiff reasonably expected that the variable rates for electricity would reflect the market prices for electricity and that Defendant would refrain from price gouging.  Without these reasonable expectations, Plaintiff and other Class members would not have agreed to buy electricity from Defendant.

152.    Defendant breached the implied covenant of good faith and fair dealing by arbitrarily and unreasonably exercising its unilateral rate-setting discretion to price gouge and frustrate Plaintiff and other Class members' reasonable expectations that the variable rates for electricity would be commensurate with market conditions.

153.    Defendant acted in bad faith when it made contractual promises to base its rates on market conditions knowing full well that its rates were substantially higher than rates that are actually based on market conditions, including rates charged by competitors.

154.    As a result of Defendant's breach, Defendant is liable to Plaintiff and other Class members for actual damages in an amount to be determined at trial and attorney's fees.

//

//

//

//

//

## COUNT VI
## UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class,
### In the Alternative to Count IV)

155. Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

156. If the Court finds no contract existed between Plaintiff and Defendant, Plaintiff brings this claim for unjust enrichment on behalf of herself and the Class.

157. Verde has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein to the detriment of Plaintiff and the Class.

158. Verde has been enriched by a benefit in the form of payment of exorbitant Variable Rates.

159. Verde's enrichment was at the expense of Plaintiff and the Class.

160. It would be unjust to allow Verde to retain the benefit.

161. Plaintiff and the Class are entitled to disgorgement and restitution of all wrongfully obtained gains received by Verde as a result of its wrongful conduct alleged herein.

162. Plaintiff and members of the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendant as follows:

A. Certifying this matter as a class action for money damages pursuant to Fed. R. Civ. P. 23(b)(3);

B. Appointing Plaintiff as class representative, and appointing Plaintiff's attorneys as class counsel;

    C.  Awarding compensatory and punitive damages in favor of Plaintiff and the other Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing in an amount to be determined at trial;

    D.  Awarding Plaintiff and the Class Members actual damages, compensatory damages, treble damages, and attorneys' fees and costs pursuant to N.Y. Gen. Bus. Law § 349.

    E.  Awarding Plaintiff and the Class Members actual damages, compensatory damages, treble damages, and attorneys' fees and costs pursuant to N.Y. Gen. Bus. Law § 349-d; *et seq*.

    F.  Awarding pre-judgment and post-judgment interest and costs of suit; and

    G.  Awarding any and all other relief that this Court may deem to be just and practicable.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action so triable.

Dated: January 21, 2020          Respectfully Submitted By:

                 */s/ Jonathan Shub*
                 Jonathan Shub (NY I.D. 4747739)
                 Kevin Laukaitis*
                 **KOHN, SWIFT & GRAF, P.C.**
                 1600 Market Street, Suite 2500
                 Philadelphia, PA  19103-7225
                 T:  215-238-1700
                 F:  215-238-1968
                 jshub@kohnswift.com
                 klaukaitis@kohnswift.com

                 Daniel K. Bryson*
                 Harper T. Segui*
                 **Whitfield Bryson & Mason, LLP**
                 900 W. Morgan Street
                 Raleigh, NC 27603

T: 919-600-5000
dan@wbmllp.com
harper@wbmllp.com

Gregory F. Coleman*
Lisa A. White*
**GREG COLEMAN LAW PC**
First Tennessee Plaza
800 S. Gay Street. Suite 1100
Knoxville, TN 37929
T: (865) 247-0090
F: (865) 522-0049
greg@gregcolemanlaw.com
Lisa@gregcolemanlaw.com

*Application to be Admitted *Pro Hac Vice* forthcoming

*Attorneys for Plaintiff and the Class*